THE ELIZABETH M. BAKER.

THE BLACK HAWK.

THE JOSEPH F. MESECK.

THE EUGENE MESECK.

THE TOP SERGEANT.

THE N. Y. CENTRAL 20.

Nos. 13612, 13617, 13619.

District Court, E. D. New York.
June 21, 1933.

Macklin, Brown, Lenahan & Speer and Paul Speer, all of New York City, for libelants.

Hunt, Hill & Betts, John W. Crandall, and D. W. L. Hawkins, all of New York City, for Steamship Black Hawk, and respondent American Diamond Lines, Inc.

Purdy & Purdy and John E. Purdy, all of New York City, for Steamtug Eugene Meseck.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, Robt. S. Erskine, and Andre V. Cherbonnier, all of New York City, for Steamtug Joseph F. Meseck and Meseck Towing Lines, Inc.

Foley & Martin and J. A. Martin, all of New York City, for Steamtug Top Sergeant.

Jacob Aronson and K. O. Mott-Smith, both of New York City, for New York Central 20.

CAMPBELL, District Judge.

The three above entitled suits arise out of a collision at Pier K, Weehawken, N. J., on December 29, 1932. By stipulation they were tried together, and one opinion will suffice.

The first above entitled suit is brought by Annie Baker, who is alleged to be the

owner of the grain boat Elizabeth M. Baker, which was sunk.

The second above entitled suit is brought by Smith-Murphy Company, Inc., which is alleged to be the owner of the cargo of wheat lately laden on board the barge Elizabeth M. Baker.

The third above entitled suit is brought by Joseph A. Ryan, who is alleged to be the owner of the barge Marion Ryan, which was damaged in said collision.

Each of these suits was brought against the steamship Black Hawk, steamtugs Joseph F. Meseck, Eugene Meseck, Meseck Towing Lines, Inc., and American Diamond Lines, Inc.

In each of the above entitled suits the steamtug Top Sergeant was on the petition of the respondent, American Diamond Lines, Inc., owner of the steamship Black Hawk, impleaded under the 56th Rule in Admiralty (28 USCA § 723).

In each of the above entitled suits, the tug New York Central 20 and the New York Central Railroad Company were on the petition of Meseck Towing Lines, Inc., claimant of the steamtug Joseph F. Meseck, impleaded under the 56th Rule in Admiralty.

Incorporation, ownership, and jurisdiction as to all parties, as alleged in the pleadings, was admitted.

On the morning of December 29, 1932, the steamtugs Joseph F. Meseck and Eugene Meseck, pursuant to the request of the Black Diamond Steamship Corporation, general agent and as such operating the steamship Black Hawk, were sent by Meseck Towing Lines, Inc., which was operating and controlling said tugs, to Pier K, Weehawken, to assist in undocking the steamship Black Hawk, the master of the steamtug Eugene Meseck to board said steamship and act as pilot under Meseck's pilotage clause, which was admittedly known to the owner of the Black Hawk, and which made the master of the Eugene Meseck the agent of the owner of the Black Hawk and of said vessel.

According to said agreement the said steamtugs arrived at Pier K, Weehawken, at about 7 o'clock a. m. that day, to assist in undocking the Black Hawk, but she was not ready and the said steamtugs Joseph F. Meseck and Eugene Meseck, after waiting a little while, left to assist in undocking another ship on the New York side of the river.

When the two Meseck Tugs arrived and when they went away, there were at the end of Pier K four barges, the Erie 343 being made fast across the end of the pier, the Lackawanna 531 alongside the Erie 343, the Pennsylvania 458 alongside the Lackawanna 531, and the Pennsylvania 498 alongside the Pennsylvania 458.

The Erie 343 lay about 10 feet up river from the south end of the pier, and each of the other boats lay about 5 feet up river from the down river end of the boat inside of her.

At about 7:50 o'clock a. m. the tug Top Sergeant, with two grain boats, Elizabeth M. Baker and Marion Ryan, in tow on two hawsers in tandem style, bow first, in the order named, arrived off the south side of Pier K.

The Baker and Ryan were consigned to the Black Heron, a sister ship of the Black Hawk, which was lying on the south side of Pier K, farther out toward the outer end than the Black Hawk.

When the Top Sergeant and her tow were over toward Pier K, she let go the two hawsers and picked up the tow alongside by making fast the port side of the tug to the Elizabeth M. Baker.

The Top Sergeant then proceeded to go in on the south side of Pier K at about 7:50 o'clock a. m., at which time there was a grain elevator alongside the Black Heron toward which the Top Sergeant directed her tow, but was told by some one not to come in the slip as the ship was going out.

There is a conflict as to what was said by way of warning, and the witnesses on behalf of the Top Sergeant were not able to identify the person who gave the warning.

The Top Sergeant knew that the Black Hawk was going out, and that was why she was told not to come into the slip.

The Top Sergeant then headed her tow downstream, put her wheel hard-astarboard and pushed them down head to the tide, after which the tug placed two stern lines on the tow and dropped the barges down alongside the barges on the end of Pier K.

On the order of the master of the tug, the Elizabeth M. Baker put out two bow lines to the Pennsylvania 498 and the tug dropped down alongside the Elizabeth M. Baker, and the master of the tug told the captain of the Elizabeth M. Baker that the shifting tug would take care of him later. Whereupon the tug Top Sergeant, at 8:15 o'clock a. m., left to perform other work. No stern lines were put out from the tow, and the tow angled out in the river, the stern of the Baker being out 10 to 12 feet.

I can find no violation of law on the part of the tug Top Sergeant in placing the grain boats outside of the other boats at the end of Pier K, one at least of which had been placed there by the shifting tug, which was a contributing cause of the accident. The most that could be said would be that it was merely a condition. No request was made of the barges to move, but the shifting tug No. 20, employed in shifting loaded boats alongside the steamship to discharge their cargo, and shifting light boats away from the steamship after discharge, had been ordered before the moving of the Black Hawk to stand by the grain boats.

The Marion Ryan was made fast astern of the Elizabeth M. Baker with four lines, one at each corner, and two cross lines, but before the collision, one of these lines was let go by the captain of the Ryan, and that let her bow go around some distance, but the Ryan did not put out any lines to any of the boats at the end of Pier K.

The American Diamond Line had a lease of the south side of Pier K, with permission to use the north side when it wanted it, from the New York Central Railroad Company, and on the day in question the American Diamond Line was occupying the entire pier.

The New York Central Railroad Company, also by agreement with the American Diamond Lines, Inc., furnished a shifting tug which shifted boats under the orders of the Black Diamond Line, its officers, agents, or servants. The shifting tug furnished by the New York Central Railroad Company, on the day in question, was the No. 20.

There was really no slip to the south of Pier K, as the next pier to the south is over a quarter of a mile distant therefrom, but there were four dolphins, each about 200 feet distant from the south side of Pier K, the outer one being about 200 feet from the pier end.

This dolphin was about 8 or 9 feet out of water.

There were lying on the south side of Pier K on the morning in question, bow in, the steamship Black Hawk, 401 feet long, 54 feet beam, with her bow about 200 feet from the bulkhead, and the Black Heron, a sister ship of the Black Hawk.

The bow of the Black Heron was about 50 feet astern of the Black Hawk, and her stern was about 50 feet in from the end of the pier.

Alongside the port side of the Black Heron was the grain elevator Oswego, 125 to 130 feet long, 32 to 33 feet beam. The bow of the Oswego was about opposite No. 5 hatch of the Black Heron, and the stern of the Oswego a few feet aft of amidships of the Black Heron.

With the south side and the end of Pier K occupied as aforesaid, at 8:40 o'clock a. m. on the day in question, the steamtugs Eugene Meseck and Joseph F. Meseck returned to assist in undocking the Black Hawk, which was bound for Antwerp and was to be moved under her own steam.

The Black Hawk finished loading about 7:45 o'clock a. m., and her master gave the order to stand by the engines at 8:25 a. m.

Capt. John Melestich, generally known as Capt. Martin, by which name I will refer to him hereafter, the master of the Eugene Meseck, went upon the bridge of the Black Hawk to act as pilot in undocking the vessel and left his pilot, Peter Bogoesch, a licensed master, in charge of the Eugene Meseck.

Capt. Martin ordered the tug Eugene Meseck to take a bow line off the Black Hawk's port bow to pull her off from the dock, keep the ship clear of the shed, and to square her off. After that he gave an order to the Eugene Meseck to let go of the hawser when he got squared off, and drop on the bow and follow the ship out, and guide the ship out.

All of the orders of Capt. Martin to the Eugene Meseck were properly and promptly obeyed by her, and no act of omission or commission on the part of the tug Eugene Meseck negligently caused or contributed to the collision.

Capt. Martin gave orders to the steamtug Joseph F. Meseck to take a hawser off the port stern of the Black Hawk and square the ship off, and also asked her, if she had a good line, to put out her own line.

The Joseph F. Meseck put out her own line as ordered.

Capt Martin was a man of experience in docking and undocking ships in New York harbor, having acted as pilot in such docking and undocking almost daily for about nineteen years.

As the Black Hawk left the dock there were on her bridge Capt. Martin, the pilot, Capt. Wheeler, master of the Black Hawk, Hauffman, the Sandy Hook pilot, and Andrew G. King, third officer of the Black Hawk, and Moll the quartermaster, who was also a cadet.

Mietchkoff, the second officer, was sta-

tioned on the poop deck and, assisted by some of the sailors, took the hawser from the Joseph F Meseck through the center stern chock of the Black Hawk, and personally placed the eye of the hawser around the after post of the starboard bitt.

At 8:49 o'clock a. m. the Black Hawk cast off her lines to the dock, and Capt. Wheeler, the master of the Black Hawk, said to Capt. Martin, "It is all clear aft." Capt. Wheeler had made no investigation as to what boats were on the end of Pier K, and Capt. Martin, who as pilot was the agent of the Black Hawk and her owner, and not of the Meseck Towing Line, Inc., must have seen the grain boats at the end of Pier K outside of the four other boats, when the Meseck tugs returned at 8:40 a. m. to assist in undocking the Black Hawk.

 As Capt. Martin said he would not have gone out if he had known the grain boats were there, then the Black Hawk and her owners were guilty of negligence in leaving the pier without notifying the grain boats to move, or having them moved by the shifting tug.

The weather was clear with a moderate easterly wind and flood tide then running about two knots.

The tugs Eugene Meseck and Joseph. F. Meseck, assisted by the engine of the Black Hawk, squared the Black Hawk up to go out of the slip, clearing the Black Heron and the grain elevator Oswego, and proceeded to back out of the slip.

At 8:59 o'clock a. m., the engine of the Black Hawk was put slow astern, stopped, and put half astern, at 8:59½ stop, at 9 slow astern, at 9:01 full speed astern with a jingle, at 9:02 stop, at 9:05 full ahead, at 9:06 slow, at 9:13 stop, and at 9:15 slow ahead. The Black Hawk then started to proceed down the river.

The Black Hawk in proceeding out of the slip was close to the grain elevator Oswego, being about 6 feet off her.

The tug Joseph F. Meseck with her line was at an angle of about 45 degrees to the Black Hawk, and was assisting the Black Hawk to back out from the south side of Pier K.

As the Black Hawk approached the outer dolphin there was not sufficient room for the tug Joseph F. Meseck to pass between the Black Hawk and that dolphin, and the tug Joseph F. Meseck passed on the other side of the dolphin, allowing her line to the Black Hawk to slacken and lifting the same over the dolphin.

The Black Hawk was then going astern, and the tug Joseph F. Meseck then picked up the slack, the line parted, and the stern of the Black Hawk by the force of the flood tide was being carried toward Pier K.

There is a sharp conflict in the evidence as to whether the line parted immediately on taking up the slack and subjecting it to strain, or after the slack had been taken up and the line had been subjected to strain for an appreciable period of time, which I will discuss later.

The Joseph F. Meseck blew an alarm whistle, tried to get a hawser off the ship but could not, and went around in an effort to get on the starboard quarter of the Black Hawk, to hold her off the barges which were at the end of the pier, but did not have time.

When the pilot, Capt. Martin, heard the alarm of the Joseph F. Meseck, he signalled full speed astern with a jingle and ordered the helm of the Black Hawk hard-astarboard, the tendency of which, with a right-handed screw, was to put the stern of the Black Hawk to port and as much as possible offset the effect of the flood tide. This was the proper and seamanlike thing to do, but even if such an action could be criticized, it would impose no liability as it was action taken in extremis.

The Black Hawk continued to go astern and toward the boats at the end of Pier K.

Before the Black Hawk cast off her line at about 8:40 o'clock a. m., the New York Central 20, which was the shifting tug, reported and was ordered by the stevedore employed by the Empire Stevedoring Company, which loaded and discharged vessels at Pier K, owned by the American Diamond Lines, Inc., under the agreement with it, when the ship sailed, to go around and stand by the grain boats.

 The master of the New York Central 20 saw that the Black Hawk was not going out right away, and instead of standing by the grain boats, made fast to an ash scow anchored below the south side of Pier K, and remained there until the stern of the Black Hawk was about abreast of the bow of the Black Heron, when the New York Central 20 left the ash scow and proceeded to make fast to the Marion Ryan.

The witnesses called on behalf of the New York Central 20 say she had not completed

making fast to the Marion Ryan at the time of the collision.

This is contrary to the allegations of the pleadings on behalf of the New York Central 20, in which it is alleged that the accident did not happen until several minutes after the tug had made fast.

If, however, it be true that the No. 20 had not completely made fast to the Marion Ryan at the time of the collision, that does not relieve the No. 20, as the master of the No. 20 had seen the grain boats at the end of the pier about 15 minutes before he received the order to stand by them, and knew that the Black Hawk was going out, and yet made fast to an ash scow and did not go out to stand by the grain boats until the stern of the Black Hawk was about abreast of the bow of the Black Heron, and the failure to make fast was due to the negligence of the No. 20 in not at once obeying the order to stand by the grain barges, which it was the duty of the No. 20 to stand by and shift.

The No. 20 was not a stranger, but was in duty bound to have obeyed the order to stand by the grain boats, and its failure so to do constituted negligence and it was a contributing cause of the damage.

As soon as the stern line to the Black Hawk parted, the Joseph F. Meseck blew an alarm and her captain shouted to the No. 20 to pull the grain barges out of the way.

Capt. Martin, the pilot of the Black Hawk, called through a megaphone to the No. 20 to pull the grain boats back.

The captain of the Elizabeth M. Baker was on the bow of his boat, not on the stern as contended on behalf of the No. 20, and heard no orders from the No. 20 to cast off the Baker's lines, and I can find no reason for his not hearing such order if one had been given. I cannot find that such orders were given, nor can I find the captain of the Elizabeth M. Baker at fault, even if he knew that the No. 20 was alongside of and with a line to the Marion Ryan, as the force of the tide would have carried the Baker and Ryan quickly upstream unless held by the tug, and he had a right to expect orders from the tug before casting off his lines, as he could have done nothing himself to stop the boats from going adrift if he had cast off his lines.

The captain of the Marion Ryan could not have prevented injury by letting go her lines to the Elizabeth M. Baker, and she had no lines to any of the other boats on the pier end. The tug No. 20 being alongside, with a line to the Ryan, her captain could not act without orders from the No. 20, and the No. 20 gave him no orders to cast off his lines.

The Black Hawk continued to come out sagging up the river under the effect of the strong flood tide, and when the pilot of the Black Hawk saw that she could not clear the grain boats, he stopped her engine and let her drift so that her propeller would not come in contact with the grain boats.

The Black Hawk rubbed the third and fourth boats out, the two Pennsylvania boats, causing them and the Lackawanna boat to go adrift, and came so strongly into contact with the bow of the Elizabeth M. Baker that she shortly thereafter sank with her cargo on board, damaging both boat and cargo, and caused the Elizabeth M. Baker to come so strongly into contact with the Marion Ryan as to damage her.

The New York Central 20 cared for the Marion Ryan, and the Meseck tug picked up the barges that went adrift, with the exception of the Elizabeth M. Baker which sank.

Thereafter the Black Hawk proceeded on her voyage.

This brings us to a consideration of the hawser, the parting of which allowed the force of the tide to carry the stern of the Black Hawk up into contact with the Elizabeth M. Baker.

█ Of course, the mere fact that the hawser parted did not impose liability upon the tug Joseph F. Meseck or her operator, without some proof of negligence.

█ The hawser in question was a seven-inch hawser, the size generally and properly used for the purpose to which it was put, made by the Plymouth Cordage Company, recognized as makers of good hawsers, and was comparatively new, having been in use about a month, and having a normal life of five or six months.

The breaking point was in the eye, the stronger part of the hawser. The breaking is much more likely in the standing part, as that is a much weaker part of the hawser than the eye.

The weight of the expert testimony seems to be that the break occurred at a point where the hawser was cut or chafed, which was not necessarily a large cut or chafing and it seems clear to me that the hawser may have been sufficiently cut or chafed to part under sudden strain, without the cut or chafing being observed by the quick handling of those on the tug, or the second officer of the Black Hawk.

The evidence of the witnesses called on behalf of the Joseph F. Meseck, and also of the second officer of the Black Hawk, shows that there was no mark observed by either of them of any such cut or chafing, before or when the line was put aboard the Black Hawk. The examination they were able to make, however, was not of such a character as to have enabled them to observe a small cut or chafing sufficient to cause the line to part if subjected to a sudden strain or jerk. The line was put under strain in assisting in the undocking of the Black Hawk before there was presented the problem caused by the existence of the outside dolphin, but not a sudden strain or jerk, and it may well be that the line, having been chafed or cut before it was placed on the ship, was weakened by such strain and thus rendered unable to resist the sudden jerk or strain in suddenly taking up the slack.

There is no evidence of any examination of the line after it was placed on the bitt on the Black Hawk and before the time that it parted.

The Joseph F. Meseck could not pass between the Black Hawk and the outside dolphin, as there was not sufficient room, and therefore there was but one thing for her to do, viz., for the tug to go outside of the outer dolphin, slack the hawser, and put it over the dolphin. This was accomplished by slacking up on the line and the putting of the line over the dolphin, and then taking up the slack and proceeding to hold up the stern of the Black Hawk against the tide.

There is a sharp conflict in the evidence as to whether the tug took up the slack too quickly and so caused it to part, or whether the line was caused to part while under steady pressure from the tug, due to something on the ship which caused the chafing.

The Black Hawk was going astern a knot or a knot and one-half an hour, that is, one hundred to one hundred and fifty feet a minute, and the evidence, which is conflicting, shows that the hawser parted sometime between the time when the stern of the Black Hawk was 170 feet inside of the pier and 30 feet from the dolphin, and the time when it was about even with or 25 feet inside of the outer end of Pier K.

The hawser parted somewhere between 9 o'clock and 9:01, when the signal for full speed astern and the jingle was given.

The tide was felt more strongly as the Black Hawk's stern proceeded out toward the outer end of the pier, and though the evidence is conflicting, the evidence of two disinterested witnesses, the Sandy Hook pilot and the captain of Erie 343, is to the effect that the line parted when the Joseph F. Meseck suddenly took up the slack. The evidence of these disinterested witnesses is entitled to and I have accorded it greater weight than that of the interested witnesses.

On behalf of the Joseph F. Meseck it is argued that the time which elapsed from the time that the Black Hawk passed the outer dolphin to the time that the line parted, makes it impossible for the line to have parted due to a sudden strain, and that it parted due to the cutting or chafing of the line on the bed plate of the bitt, while over the after bollard of the bitt on the Black Hawk.

The evidence does not satisfy me that the line at the point where it parted could have been cut or chafed on any surface of the after bollard of the bitt or on the bed plate thereof, of the Black Hawk, and no witness definitely placed the break in the line at any such place. The most that can be said with reference to the possible chafing of the eye of the hawser while on the Black Hawk is that it is speculative.

Before the Joseph F. Meseck passed outside of the dolphin, she had been moving at an angle of forty-five degrees to the Black Hawk, whereas after the hawser had been put over the dolphin by the Joseph F. Meseck, due to the increased force of the tide, she was obliged to pull more nearly at right angles to the Black Hawk, and the sudden jerk did not occur immediately after the hawser had been lifted over the dolphin.

I am convinced that the parting of the line was caused by the negligent taking up of the slack too quickly by the Joseph F. Meseck.

No special orders for passing the hawser over the dolphin, or for suddenly taking up the slack, were given by the pilot, Capt. Martin, and the Black Hawk is under no liability for the independent action of the master of the Joseph F. Meseck.

The use of a tug having a stern line on the vessel with the dolphins located as they were did not present such an unusual situation as to impose liability on the Black Hawk.

There was no fault on the part of any respondent, respondent impleaded, or any of the vessels in the use of but two tugs in undocking the Black Hawk, as that was the customary number used and would have been sufficient but for the parting of the hawser.

The steamtug Joseph F. Meseck and the

respondent Meseck Towing Line, Inc., which controlled and operated said tug, were guilty of negligence in taking up too quickly, with a sudden strain or jerk, the hawser to the stern of the Black Hawk, which had been cut or chafed before being placed on the Black Hawk, and by the breaking of said hawser to allow the Black Hawk to come into collision with the boats at the end of Pier K, damaging the barges Elizabeth M. Baker and Marion Ryan, and the cargo of the Elizabeth M. Baker.

The steamship Black Hawk and her owner, the respondent American Diamond Lines, Inc., were guilty of negligence in going out of the slip with the grain boats and the four boats inside of the grain boats, moored on the end of Pier K, without notifying them to move or causing them to move, and that such negligence was a contributing cause of the collision and damages to the barges Elizabeth M. Baker and Marion Ryan, and the cargo of the Elizabeth M. Baker.

The steamtug New York Central 20 and her owner, the respondent New York Central Railroad Company, were guilty of negligence in failing to promptly stand by and make fast to the grain boats, and in failing promptly to order the captain of the Elizabeth M. Baker to cast off her lines, and to allow the Elizabeth M. Baker and the Marion Ryan to be carried to safety by the tide or the action of the tug, and that such negligence was a contributing cause and not a condition of the damages to the barges Elizabeth M. Baker and Marion Ryan, and the cargo on the Elizabeth M. Baker.

The steamtug Eugene Meseck obeyed all orders promptly and is without fault.

The steamtug Top Sergeant is without fault.

Neither the barges Elizabeth M. Baker, nor Marion Ryan, nor the libelants Annie Baker, Smith-Murphy Company, Inc., nor Joseph A. Ryan, nor any one for whose actions either of them are responsible, negligently caused or contributed to the damages caused by the collision, and are without fault.

That the libelant in each of the above entitled suits is entitled to the usual decree for one-third damages and one-third costs against each of the following vessels and their owners or operators, to wit: Steamtug Joseph F. Meseck and her operator, Meseck Towing Line, Inc., steamship Black Hawk and her owner, American Diamond Line, Inc.; and steamtug New York Central 20 and her owner, New York Central Railroad Company,

with the usual order of reference; and the steamtug Eugene Meseck to a dismissal of the libel as to her in each of the above entitled suits, with costs against the libelant; and the steamtug Top Sergeant to a dismissal of the petition and libel as to her in each of the above entitled suits, with costs against the American Diamond Lines, Inc., the petitioner.

That a decree may be entered in each of the above entitled suits in accordance herewith.

Settle decrees on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.